**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE CITIGROUP INC. | : | |
| SHAREHOLDER DERIVATIVE | : | Lead Case No. 12-cv-3114-JPO |
| LITIGATION | : | |
| | : | |
| This Document Relates to: | : | |
| ALL ACTIONS | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' COUNSEL'S MOTION
FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND REQUEST FOR
<u>LIMITED DISCOVERY</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND.........................................5

        A.      Background of the Action .................................................................5

        B.      Shareholders Reject the Board's 2011 Executive Pay Recommendation...............6

        C.      The Action Is Commenced and Prosecuted, and Pandit and Havens Are Forced To "Resign" .....................................................7

        D.      Plaintiffs' Counsel Demands That Pandit and Havens Receive No Exit-Related Benefits .........................................................8

III.    LEGAL ARGUMENT.....................................................................................10

        A.      Plaintiffs' Counsel Are Entitled To A Fee Award In The Amount Of $6 Million Pursuant To The "Corporate Benefit Doctrine".........................10

                1.      Applicable Standards ...........................................................10

                2.      Defendants Cannot Satisfy Their Heavy Burden of Demonstrating that Plaintiffs' Action Was Not At Least In Part a Cause of the Benefits Obtained.................................................12

        B.      The Amount of Attorneys' Fees and Expenses Requested Is Fair and Reasonable ..........................................................17

                1.      Legal Standard .....................................................................17

                2.      The Time and Labor Expended..............................................18

                3.      Public Policy Considerations ................................................19

                4.      The Standing and Efforts of Plaintiffs' Counsel.....................21

                5.      The Benefits Derived Through The Litigation .........................22

IV.     CONCLUSION..............................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Electrical Pension Fund v. Brown*,
   941 A.2d 1011 (Del. 2007) ..................................................................22

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ...................................................................14

*Barton v. Drummond Co.*,
   636 F.2d 978 (5th Cir. 1981) ..............................................................21

*Baupost Ltd. P'ship 1983 A-1 v. Providential Corp.*,
   CIV. A. 12978, 1993 WL 401866 (Del. Ch. Sept. 3, 1993) ..................23

*Behrens v. Triathlon Broadcasting Co.*,
   C.A. No. 16560 (Del. Ch. Aug. 29, 2000) (Order) ...............................23

*Blau v. Rayette-Faberge, Inc.*,
   389 F.2d 469 (2d Cir. 1968)................................................................10

*Brautigam v. Bratt*,
   No. 98 Civ. 9060 (JSM), 2000 WL 1264289 (S.D.N.Y. Sept. 5, 2000) ...............10, 11, 12, 15

*Chrysler Corp. v. Dann*,
   223 A.2d 384 (Del. 1949) .............................................................12, 17

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)................................................................19

*Cosgrove v. Sullivan*,
   759 F. Supp. 166 (S.D.N.Y. 1991)......................................................19

*Dottenheim v. Emerson Electric Mfg. Co.*,
   7 F.R.D. 195 (E.D.N.Y. 1947) .......................................................11, 19

*Dow Jones & Co. v. Shields*,
   No. 184, 1991, 1992 WL 44907 (Del. Ch. Jan. 10, 1992)....................18

*Franklin Balance Sheet Inv. Fund v. Crowley*,
   C.A. No. 888-VCP, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007).....17, 23

*Glendora Cmty. Redevelopment Agency v. Demeter*,
   155 Cal. App. 3d 465 (Ct. App. 2nd Dist. 1984) .................................19

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)......................................................18, 19, 22

*Heller v. Starwood Hotels & Resorts Worldwide, Inc.*,
   332 F. Supp. 2d 587 (S.D.N.Y. 2004) .......................................................................14

*In re Anderson Clayton S'holders Litig.*,
   Civ. A. 8387, 1988 WL 97480 (Del. Ch. Sept. 19, 1988) ..................................18, 22

*In re Citigroup, Inc. S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ..........................................................................14, 15

*In re F&M Distribs., Inc. Sec. Litig.*,
   No. 95-CV-71778, 1999 U.S. Dist. LEXIS 11090 (E.D. Mich. June 29, 1999) .....................20

*In re Genentech, Inc. S'holders Litig.*,
   No. 3911-VCS (Del. Ch. July 9, 2009) (Order) ........................................................19

*In re Golden State Bancorp Inc. S'holders Litig.*,
   CIV.A. 16175, 2000 WL 62964 (Del. Ch. Jan. 7, 2000) .............................................22

*In re Intek Global Corp. S'holders Litig.*,
   C.A. No. 17207 (Del. Ch. Apr. 24, 2000) (Order) ...................................................22

*In re MAXXAM Group, Inc. S'holders Litig.*,
   No. 8636, 1987 WL 10016 (Del. Ch. Apr. 16, 1987) .................................................22

*In re Metropolitan Life*,
   935 F. Supp. 286 (S.D.N.Y. 1996) .........................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................................20

*In re Oppenheimer Capital Unitholders Litig.*,
   C.A. No. 16022 (Del. Ch. Oct. 20, 1998) ..............................................................23

*In re Pepsico Sec. Litig.*,
   No. 82-8403, 1985 U.S. Dist. LEXIS 20372 (S.D.N.Y. Apr. 26, 1985) ..............................20

*Joseph v. Shell Oil Co.*,
   Civ. A. 7450, 1985 WL 150466 (Del. Ch. Apr. 22, 1985) ..........................................22

*Koppel v Wien*,
   743 F.2d 129 (2d Cir. 1984) ................................................................10, 11, 13, 21

*Louisiana Mun. Police Emps. Ret. Sys. v. Ritter*,
   CV-2009-001588 (Ala. Cir. Ct. Jefferson Cty. May 6, 2010) (Order) ...........................15

*McKittrick v. Gardner*,
   378 F.2d 872 (4th Cir. 1967) ................................................................................19

*Muchnick v. First Fed. Sav. & Loan Assoc.,*
   Civ. A. No. 86-1104, 1986 U.S. Dist. LEXIS 19798 (E.D. Pa. Sept. 30, 1986) ....................19

*NECA-IBEW Pension Fund ex rel. Cincinnati Bell, Inc. v. Cox*,
   No. 1:11-CV-451, 2011 WL 4383368 (S.D. Ohio Sept. 20, 2011) ..........................................15

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ..............................................................................................14

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. 1992)..............................................................................21

*Savoie v. Merchants Bank*,
   84 F.3d 52 (2d Cir. 1996) .........................................................................11, 12, 13

*Smith v. Van Gorkom*,
   Civ. A. 6342, 1985 WL 22040 (Del. Ch. Oct. 11, 1985).......................................22

*Sugarland Indus., Inc. v. Thomas*,
   420 A.2d 142 (Del. 1980) ..........................................................................................22

*The Stop & Shop Supermarket Co., et al. v. Smithkline Beecham Corp.*,
   No. Civ. A. 03-4578, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005) ......................19

*Thorpe v. CERBCO, Inc.*,
   Civ. A. 11713, 1997 WL 67833 (Del. Ch. Feb. 6, 1997), *aff'd*, 1997 Del. LEXIS 438
   (1997)...........................................................................................................................23

*Weiss v. Mercedes-Benz of N. America*,
   899 F. Supp. 1297 (D.N.J. 1995) ..............................................................................19

Counsel for Stanley Moskal, James Kenney, and Silvester Sciuto (collectively "Plaintiffs"), The Weiser Law Firm, P.C., Robbins Arroyo LLP, Ryan & Maniskas LLP, and Law Offices of Curtis V. Trinko, LLP (collectively, "Plaintiffs' Counsel"), hereby respectfully submit this memorandum of law in support of their Motion for an Award of Attorneys' Fees and Expenses and Request for Limited Discovery (the "Motion") in the amount of $6 million in the above-captioned shareholder derivative action (the "Action") brought on behalf of Citigroup Inc ("Citigroup" or the "Company").[1]

## I.      INTRODUCTION

This Action underscores the substantial and swift benefits that can be derived by the diligence of shareholders who challenge corporate misconduct through derivative litigation.  On March 8, 2012, Defendants lobbied Citigroup shareholders by means of the Company's Proxy Statement (the "Proxy") to approve excessive 2011 executive compensation totaling $54 million for the Company's senior officers, despite the fact that Citigroup's stock price plummeted in 2011 by 44% and Defendants reported dismal 2011 financial results, including an $8.25 billion decline in revenues.  A mere eight months later, although characterized publicly as "resignations," Defendants in essence terminated the employment of the Company's Chief Executive Officer ("CEO"), defendant Pandit, and its President and Chief Operating Officer ("COO"), defendant Havens[2] without any severance (even though Pandit and Havens were not terminated "for cause"), and forced them to forfeit millions of dollars' worth of compensation

---

[1] "Defendants" to the Action, all of whom are current or former officers and directors of Citigroup, include the following: Vikram Pandit ("Pandit"), John C. Gerspach, John P. Havens ("Havens"), Manuel Medina Mora, Alain J.P. Belda, Timothy C. Collins, Robert L. Joss, Michael E. O'Neill, Richard D. Parsons, Lawrence Ricciardi, Judith Rodin, Robert L. Ryan, Anthony M. Santomero, Diana L. Taylor, William S. Thompson, Jr., Ernesto Zedillo Ponce de Leon, and Brian Leach.

[2] In addition, Havens served as CEO of Citigroup's Institutional Client Group.

1

benefits, including some of the very same items of compensation they previously recommended to shareholders.[3]

Under controlling Second Circuit authority, the Court will grant attorneys' fees to Plaintiffs' Counsel if it determines that this Action was, at least in part, a cause of the corporate benefits derived.  However, where defendants takes corrective action to moot a shareholder suit, as Defendants did here, the ***entire onus*** is placed on Defendants to demonstrate that the Action did not in any way cause the benefits obtained.  Indeed, as explained herein, Plaintiffs need not even show their Action would have (or could have) survived a motion to dismiss.  Defendants carry the heavy burden of establishing that no causal connection whatsoever exists between the actions of Plaintiffs' Counsel and the resulting benefits to Citigroup, and they cannot carry this burden.

The undisputed facts and chronology of events demonstrate that this Action and critical steps taken by Plaintiffs' Counsel were, at the very least, a partial cause of Pandit's and Havens' sudden "resignations," and the Board's subsequent decision to acquiesce to Plaintiffs' demand that the Company deny severance and rescind 2011 payments made to the aforementioned executives.  Plaintiffs initiated this Action in April 2012, alleging that the Board's authorization of substantial 2011 pay increases for, among others, defendants Pandit and Havens, was in

---

[3] Defendants apparently would like this Court (and stockholders) to believe Pandit and Havens simply quit their incredibly lucrative jobs as Wall Street titans one day for no reason out of the blue, and that Defendants then decided to provide them no benefits and to clawback previously awarded compensation which they themselves recommended, solely on their own volition.  And of course, Defendants want Plaintiffs' Counsel and this Court to accept this fallacy, yet they have provided no documentary support whatsoever that would create an evidentiary record.  Boiled down, Defendants' main argument is "the Action had nothing to do with any of this, because we say so."

violation of the Board's publicly stated pay-for-performance executive compensation policy.[4] Plaintiffs' Complaint set forth compelling allegations concerning the discrepancy in the executive compensation approved by the Board compared to the Company's performance and the performance of its stock, and the Board's own recent history of being found subject to potential liability based on excessive executive compensation.  Defendants moved to dismiss Plaintiffs' Action on October 11, 2012.  On October 16, 2012, Pandit and Havens abruptly "resigned" from their respective positions in the Company.

In addition to filing a well-pled Complaint, Plaintiffs and their counsel led the charge for every corrective action undertaken by Defendants for the benefit of the Company.  Critically, on October 19, 2012, merely days after the announcement of Pandit's and Havens' so-called "resignations," Plaintiffs' Counsel sent a letter to counsel for Defendants demanding that no severance-related benefits be paid to Pandit or Havens.[5]  Plaintiffs' Counsel thereafter received a response from Mary Eaton, Esq. ("Ms. Eaton"), counsel for Defendants, assuring Plaintiffs that their demands had been relayed to the Company's Board of Directors (the "Board") for consideration.[6]  Less than three weeks later, it was announced that Pandit and Havens would not receive any severance-related benefits in connection with their departures from Citigroup and that Pandit and Havens would forfeit substantial financial benefits, the value of which has never

---

[4] Plaintiffs filed their Verified Consolidated Shareholder Derivative Complaint (the "Complaint") on August 27, 2012.  All paragraph citations herein are to the Complaint.

[5] *See* Letter from Robert B. Weiser and Brian J. Robbins, dated October 19, 2012, attached hereto at Exhibit A.

[6] *See* Letter from Mary Eaton, dated October 22, 2012, attached hereto at Exhibit B.  Ms. Eaton's letter also claimed the Board would respond to Plaintiffs' Counsel's October 19 letter "in due course."  However, no response of any kind was ever sent on behalf of the Board to Plaintiffs' Counsel.  The Board's actions and its silence both speak volumes.

been disclosed but which have been estimated by the media to be in the range of at least $43 million.[7]

Accordingly, the undisputed factual record demonstrates the following: (1) Plaintiffs initiated the Action in April 2012, alleging that the Board's authorization of substantial 2011 pay increases for, among others, defendants Pandit and Havens, was in violation of the Board's publicly stated pay-for-performance executive compensation policy; (2) Plaintiffs filed their consolidated Complaint on August 27, 2012; (3) Pandit and Havens abruptly "resigned" on October 16, 2012; (4) Plaintiffs' Counsel demanded on October 19, 2012 that no severance-related benefits be paid to Pandit and Havens; (5) counsel for Defendants referred Plaintiffs' demands to the Board; and (6) shortly thereafter, it was announced that no severance-related benefits would be paid to Pandit and Havens and that they each were forfeiting substantial compensation.  Based on this chain of events, in the absence of any evidence to the contrary and with the presumption of causation in Plaintiffs' Counsel's favor, Defendants cannot now credibly claim that Plaintiffs' Counsel's actions had no impact on the Board's decisions.  Accordingly, because Plaintiffs and Plaintiffs' Counsel's actions have created, at least in part, undoubtedly significant benefits for the Company and its shareholders, including financial benefits estimated to be worth approximately $43 million, Plaintiffs' Counsel should be awarded a fee and expense award in the amount of $6 million.

---

[7] Plaintiffs and Plaintiffs' Counsel respectfully submit that the departures of Pandit and Havens from Citigroup, even putting aside their respective (and considerable) pay forfeitures, conferred benefits on the Company.  To be clear, removal of a CEO is hardly always a goal of derivative litigation -- nor would it always be desirable -- but in this particular instance, in light of the 95% decline in Citigroup's stock price during Pandit's tenure as CEO starting in 2007, Plaintiffs submit that Pandit's departure was and is a huge benefit for Citigroup and its shareholders.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Background of the Action

This Action is a "say on pay" shareholder derivative action brought in this Court pursuant to federal question jurisdiction[8] arising from the Board's unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on executive compensation -- namely, the Board's authorization of excessive 2011 compensation for the same executives responsible for the Company's dismal financial results in 2011.  ¶2.  In particular, in 2011, the amounts of executive compensation awarded to top Citigroup executives totaled $54 million, $15 million of which was compensation for Citigroup's CEO, defendant Pandit, representing an astounding raise in compensation of ***1,499,999,900%*** over his 2010 level of compensation.  *Id.*[9]

Meanwhile, Defendants and, in particular, the Board's Personnel and Compensation Committee (the "Compensation Committee") represented publicly that the Board's executive compensation practices were rooted in a pay-for-performance policy, which is purportedly dependent upon the Company's financial performance and the enhancement of stockholder value.  ¶3.  For example, in the Proxy, filed on Form DEF 14A with the U.S. Securities and Exchange Commission ("SEC") and disseminated to Citigroup stockholders on March 8, 2012, the Board claimed that its executive compensation policy was designed to achieve ***"the long-term best interests of the stockholders. . ."***  *Id.*  Additionally, the Board claimed that its executive compensation policy was contingent upon "enhance[ing] stockholder value."  *Id.*  Further, the Board claimed that in determining the amounts of executive compensation awards, it

---

[8] Plaintiffs asserted claims in the Action for breach of fiduciary duty and unjust enrichment under Delaware state law (as Citigroup is a Delaware corporation), and under Section 14(a) of the Securities Exchange Act of 1934 based on allegations that Defendants issued false and misleading statements and/or omitted material facts in the Proxy.

[9] Further, defendant Havens received $13 million in 2011 compensation.  ¶53.

valued "overall company performance." *Id.*

In addition to violating its own purported pay for performance policy, the Board's decision to award excessive 2011 executive compensation demonstrates that the Board's prior statements that it would pay for performance and reward long-term performance were false and misleading.  ¶4.  Essentially, the Board represented that executive pay was inextricably tied to Company performance and enhancement of shareholder value -- and that an increase in compensation would occur only if the Company's executives created meaningful, long-term performance for Citigroup stockholders, and conversely, they would receive less compensation if they did not produce these results.  *Id.*  However, contrary to their public representations, the Board awarded excessive pay increases to Citigroup's senior executives, and in particular, to defendants Pandit and Havens, despite Citigroup's woeful financial results and plummeting stock price.  *Id.*

Indeed, in 2011, Citigroup stock declined in market value by over 44%, and the Company reported a year-over-year decrease in revenues from $86.6 billion in 2010 to $78.35 billion in 2011.  ¶5.  This is likewise true regarding the "long-term interest" of Citigroup stockholders, as the price of the Company's common stock plummeted by almost *95%* over the previous five years (representing Pandit's entire tenure as CEO).  *Id.*

**B.     Shareholders Reject the Board's 2011 Executive Pay Recommendation**

Fortunately for Citigroup shareholders, a "say on pay" vote (the "Vote") was conducted via the Proxy, whereby Citigroup shareholders were afforded the chance to voice their dissatisfaction with the Board's clear disregard for their interests, the Board's own prior statements regarding its pay for performance compensation policy, and the Board's apparent refusal to acknowledge the Company's dreadful financial and stock price performance in

determining senior executive compensation (and, in particular, Pandit's compensation) for 2011. ¶7. In the Proxy, the Board unsurprisingly recommended that Citigroup shareholders approve the Board's 2011 executive compensation program and the excessive executive pay hikes (including the material pay increase for Pandit), despite the fact that Defendants had failed to deliver increases to the Company's short-term *or* long-term performance. *Id.*

On April 17, 2012, a majority (approximately 55%) of voting Citigroup stockholders, (including the Plaintiffs to this Action), ***rejected*** the Board's 2011 senior officer compensation recommendation, in what the *Wall Street Journal* (the "*Journal*") called "a scathing rebuke." ¶8. Clearly, Citigroup shareholders concluded that 2011 executive compensation increases were not in their best interests, and that executive compensation was not tied to performance, contrary to what the Board had publicly represented. *Id.* Shareholder sentiment and dissatisfaction with the Company's reported levels of 2011 senior executive compensation was unmistakable. *Id.* As the *Journal* reported that same day in an article entitled "Citigroup Investors Reject Pay Plan," one major Citigroup shareholder explained that it cast a negative Vote because "the bank has not anchored rewards to performance." *Id.* According to the *Journal,* another major Citigroup shareholder stated that "compensation levels are excessively high and are not linked closely enough to the creation of shareholder value, specifically the stock price," and still another major shareholder voted against the proposed 2011 executive pay because there was no "connection between the company's performance and payout." *Id.*

### C.     The Action Is Commenced and Prosecuted, and Pandit and Havens Are Forced To "Resign"

Plaintiffs' initial complaints were filed on or about April 19, 2012, two days after the Vote.  Plaintiffs subsequently filed their consolidated Complaint on August 27, 2012.  On October 16, 2012, six months after the Action was initiated, and seven weeks after Plaintiffs filed

the Complaint, in a surprise announcement,[10] Citigroup disclosed that Pandit had abruptly "resigned" as CEO of Citigroup and as a member of the Board, effective immediately.  In addition, Citigroup disclosed that defendant Havens also abruptly "resigned" all of his executive positions with Citigroup, effective immediately.[11]

### D.    Plaintiffs' Counsel Demands That Pandit and Havens Receive No Exit-Related Benefits

When the "resignations" were announced on October 16, 2012, there were no additional public disclosures regarding the specific terms and conditions of the departures of Mr. Pandit and Havens from Citigroup.  There was public speculation in the financial media, however, that these individuals might ultimately receive lucrative "exit packages" or "separation plans" from Citigroup in connection with their "resignations."  Accordingly, on October 19, 2012, Plaintiffs' Counsel sent a letter to counsel for Defendants demanding that the Company not provide any severance-related benefits whatsoever to Messrs. Pandit or Havens.  *See* Exhibit A.  On October 22, 2012, Plaintiffs' Counsel received a letter from Ms. Eaton, one of the attorneys for the Defendants, indicating that the matters raised in Plaintiffs' October 19, 2012 letter had been referred to the Board of Directors for its consideration.[12]  *See* Exhibit B.

Less than three weeks later, on November 9, 2012, Citigroup announced, via a Current Report on SEC Form 8-K, attached hereto at Exhibit C, that it had entered into letter agreements

---

[10]  *See, e.g.,* http://www.vanityfair.com/online/daily/2012/10/Surprise-Intrigue-Citigroup-CEO-Vikram-Pandit-Mysteriously-Resigns.

[11]  The financial media was highly skeptical, to say the least, of the Board's public characterization of Pandit's and Havens' sudden departures from their highly-lucrative positions at Citigroup as "resignations."  As author and veteran Wall Street observer William Cohan put it, "nobody leaves these jobs voluntarily."  *See, e.g.,* http://finance.yahoo.com/blogs/daily-ticker/ex-citigroup-ceo-vikram-pandit-wasn-t-ready-155459451.html.

[12]  Again, no further response to Plaintiffs' October 19, 2012 letter was ever provided by the Board or Defendants' counsel.

with defendants Pandit and Havens setting forth the specific terms and conditions of their respective departures from Citigroup (the "Letter Agreements").  Citigroup further announced that upon their respective departures, Pandit and Havens would each forfeit certain compensation awards previously made to them by Citigroup, including certain awards previously granted to them during 2011.  *See* Exhibit C.  Moreover, Citigroup announced that Pandit and Havens would not be entitled to any severance payments, special benefits, or perquisites in connection with their departures from Citigroup.  *Id.*  Notably, Citigroup's public disclosures did not indicate (and to date, still have not indicated) the financial value of the compensation awards forfeited by defendants Pandit and Havens.  Multiple reports in the financial media, however, based upon information received from confidential sources, have estimated that these awards were collectively worth approximately $43 million.[13]

On November 28, 2012, a status conference was held before this Court (the "Status Conference"), at which time, in light of the above events, and their obvious impact on the Action, Plaintiffs' Counsel expressed their intention to voluntarily dismiss the claims asserted in the Action, and to thereafter file this fee application seeking the value of the services rendered by Plaintiffs' Counsel.  Plaintiffs' Counsel explained to the Court at that time, and reiterate herein, that their efforts in the Action produced (or at minimum, significantly helped to produce) unusually good results for the Company and its stockholders, including the departures of defendants Pandit and Havens, as well as significantly reduced levels of executive compensation

---

[13] For example, as *Bloomberg* reported on November 10, 2012, "Citigroup didn't disclose the value of the awards that Pandit and Havens will forfeit…Pandit will forfeit about $24 million in awards, according to a person with direct knowledge of the situation.  Havens will give up about $19 million, said the person, who declined to be identified because the figures aren't public." *See*      http://www.bloomberg.com/news/2012-11-09/citigroup-ex-ceo-pandit-gets-6-7-million-compensation-for-2012.html.

made in connection with those departures.[14]   During the recent Status Conference, counsel for

Defendants emphatically argued, *inter alia*, that the resignations of Messrs. Pandit and Havens,

and their subsequent compensation forfeitures, were not caused in any way by the actions of

Plaintiffs or Plaintiffs' Counsel.[15]

## III.   LEGAL ARGUMENT

### A.   Plaintiffs' Counsel Are Entitled To A Fee Award In The Amount Of $6 Million Pursuant To The "Corporate Benefit Doctrine"

#### 1.   Applicable Standards

This Action was brought pursuant to federal question jurisdiction, and accordingly,

federal law governs the instant application for attorneys' fees.  *See Brautigam v. Bratt*, No. 98

Civ. 9060(JSM), 2000 WL 1264289 at *1 (S.D.N.Y. Sept. 5, 2000) ("in non-diversity cases the

right to attorneys' fees is procedural and thus determined under the law of the forum hearing the

suit.").  The Second Circuit has long recognized the "common corporate benefit" doctrine, which

establishes that plaintiff's counsel are entitled to an award of attorneys' fees and expenses when

the cause of action initiated by the litigant confers a benefit on an ascertainable class of

shareholders and/or the company.  *See Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1984).[16]

---

[14] Shortly after the Action was initiated, on April 20, 2012, *Forbes* reported on the Action in an article entitled "Citi's Pandit Sued Over Excessive Compensation," and observed that a successful outcome for shareholders would include the future denial of compensation for Citigroup's senior executives.  *See* http://www.forbes.com/sites/halahtouryalai/2012/04/20/citis-pandit-sued-for-excessive-compensation/.

[15] Other neutral observers seem to disagree.  For example, GMI Ratings, which provides research coverage of, *inter alia,* the governance and accounting-related risks affecting the performance of public companies, commented on October 19, 2012, (days after defendant  Pandit's resignation) that this derivative Action "***was likely a source of contention between Mr. Pandit and the board***."  *See* http://www3.gmiratings.com/home/2012/10/is-vikram-pandits-citigroup-exit-good-or-bad-for-long-term-governance/.

[16] Notably, recovery of attorneys' fees has been permitted in the Second Circuit even when a lawsuit was never commenced.  *Blau v. Rayette-Faberge, Inc*., 389 F.2d 469 (2d Cir. 1968)

The Court's primary concern in reviewing a fee application "is whether the work performed resulted in a benefit." *In re Metropolitan Life,* 935 F. Supp. 286, 294 (S.D.N.Y. 1996). However, an action need not be brought to a successful completion in order for plaintiffs' counsel to recover attorney's fees. *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996). "Fees may be awarded even when there is no judgment on the merits or when the dispute has become moot because the relief sought is otherwise obtained." *Id*. (quoting *Koppel*, 743 F.2d at 135); *accord Brautigam*, 2000 WL 1264289 at *1.

Where a suit has been rendered moot because defendants have taken the remedial measures sought by the plaintiffs, a court may award attorney's fees where the plaintiffs' efforts were, at least in part, a "cause of the benefit obtained." *Brautigam*, 2000 WL 1264289 at *1. "When the defendant has taken action to moot the suit, ***the defendant bears the burden*** of establishing the absence of a causal connection between the suit and the defendant's corrective action." *Id.*; *Savoie*, 84 F.3d at 57; *Koppel*, 743 F.2d at 135 ("Where, as here, plaintiffs' lawsuit is mooted by defendants' corrective action, the burden properly shifts to defendants to establish the absence of a causal connection in order to defeat a claim for legal fees."). In a situation where the plaintiff's case has been mooted by the defendants' corrective actions, the plaintiff ***is not*** required to show that the complaint had sufficient merit to survive a motion to dismiss, or could have survived a motion to dismiss, in order to recover fees. *Brautigam*, 2000 WL 1264289

---

(attorneys' fees granted where plaintiff merely investigated potential violations of securities laws and issued a demand letter, prompting corporation to pursue recovery from corporate officers); *see also Dottenheim v. Emerson Electric Mfg. Co*., 7 F.R.D. 195, 197 (E.D.N.Y. 1947) (limiting recovery of attorneys' fees to cases where suit is filed would be "penalizing efficiency and expediency."). These cases stand for the common-sense notion that it is not only the activities of Plaintiffs' Counsel reflected on the docket of the Action that matter for purposes of this fee application; it is also activities "outside the docket" – specifically the October 19, 2012 letter to defense counsel demanding that Pandit and Havens receive no severance benefits – which are relevant and which warrant an award of attorneys' fees.

at *1 ("Moreover, unlike in some other circuits, in the Second Circuit the **_plaintiff is not_**

**_required to show that the complaint had sufficient merit to survive a motion to dismiss_**")

(emphasis added); _Savoie_, 84 F.3d at 57 (noting that the Second Circuit has repeatedly declined

to impose requirement that plaintiff's counsel show a complaint has sufficient merit to survive a

motion to dismiss in order to justify an award of fees, because "[i]n a case that has become

moot…the only real-world consequences remaining are matters collateral to the merits of the

suit").[17]

### 2.    Defendants Cannot Satisfy Their Heavy Burden of Demonstrating that Plaintiffs' Action Was Not At Least, In Part, a Cause of the Benefits Obtained

Defendants cannot show the absence of a causal link between Plaintiffs' efforts pursuing

this Action and the benefits derived by Citigroup.  Here, the chronology of events surrounding

the initiation of Plaintiffs' Action and the Board's subsequent decisions strongly indicates that

Plaintiffs' Counsel's efforts were at least in part a cause of Defendants' decision to force out

Pandit and Havens without severance and to rescind valuable compensation benefits, including

certain benefits awarded in 2011.  Specifically, on October 16, 2012, merely six months after the

Action was initiated, and seven weeks after Plaintiffs filed the Complaint, the Board forced

---

[17] This is a key distinction – the Second Circuit's repeated, express rejection of an analysis as to whether a complaint was "meritorious when filed" in connection with an application for attorneys' fees based on the corporate benefit doctrine presents a markedly different approach than that which has long been taken by Delaware (and certain other) courts.  Under Delaware law, on an application for counsel fees, a court must determine whether the plaintiffs had "some reasonable hope" of withstanding a motion to dismiss.  *See, e.g., Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1949).  Plaintiffs submit that Second Circuit authority, rather than Delaware law, clearly governs this fee application (*see Brautigam*, 2000 WL 1264289 at *1) and that there should therefore be no analysis of whether Plaintiffs had "some reasonable hope" of surviving Defendants' motions to dismiss.  Even assuming, *arguendo,* however, that Delaware law applied, for the reasons explained below, in this Action Plaintiffs had far more than "some reasonable hope" of defeating Defendants' motions to dismiss, and Plaintiffs' Counsel is accordingly entitled to attorneys' fees.

Pandit and Havens to "resign."   Immediately following these so-called "resignations," on October 19, 2012, Plaintiffs' Counsel sent a letter to counsel for Defendants demanding that the Company not provide any severance-related benefits whatsoever to Pandit or Havens.  *See* Exhibit A.  On October 22, 2012, Plaintiffs' Counsel received a letter from Ms. Eaton, counsel for certain of the Defendants, indicating that the matters raised in Plaintiffs' October 19, 2012 letter had been referred to the Board for its consideration.  *See* Exhibit B.

Less than three weeks later, on November 9, 2012, Citigroup announced via a Current Report on SEC Form 8-K that it had entered into the Letter Agreements with Pandit and Havens setting forth the specific terms and conditions of their respective departures from Citigroup.  *See* Exhibit C.  The Form 8-K essentially adopted all of Plaintiffs' recommendations and request for relief sought in Plaintiffs' Action and their subsequent letter to the Board.  In particular, Citigroup announced that, upon their departure, Pandit and Havens would forfeit certain compensation awards previously made to them, including certain awards previously granted to them during 2011.  *Id.*  Moreover, Citigroup announced that the Board resolved not to award severance or any related benefits to Pandit and Havens – the exact relief sought in the letter sent by Plaintiffs' Counsel to the Board on October 19, 2012.  *Id.*

It defies logic and sound reason to discount Plaintiffs' Counsel's role in the significant turn of events that saw the Board essentially adopt all of the major remedial measures sought by Plaintiffs.  Defendants cannot demonstrate that Plaintiffs' Action and pressures exerted on the Board had no substantial impact on their sudden and complete about-face.  Accordingly, the sequence, timing, and the specific corrective actions taken by Defendants at Plaintiffs' direction severely impair Defendants' ability to meet their burden in showing that Plaintiffs played no role in creating the corporate benefit.  *See, e.g., Koppel*, 743 F.2d at 135 ("The chronological

sequence of events is an important factor in determining whether or not it can be inferred that the defendants guided their actions in response to plaintiffs' lawsuit.") (internal citation omitted); *Heller v. Starwood Hotels & Resorts Worldwide, Inc.*, 332 F. Supp. 2d 587, 590 (S.D.N.Y. 2004) (holding that the court's "analysis must focus not on the plaintiff's complaint and the underlying causes of action therein, but on the sequence of events that led to the [corrective action].")

The strength of Plaintiffs' Action also undermines Defendants' efforts to show an absence of a causal link between Plaintiffs' Action and the benefits obtained. To start, Plaintiffs filed a well-pled, detailed Complaint that sets forth particularized allegations challenging the excessive remunerations afforded to, among others, Pandit and Havens for 2011.[18] Significantly, the Complaint alleges prior, similar misconduct involving excessive payments by the Board to another former CEO of Citigroup. In *In re Citigroup, Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009), the Delaware Chancery Court previously excused pre-suit demand on the Board in 2009 in a shareholder derivative action brought on behalf of Citigroup based on allegations challenging an excessive CEO compensation package, and Plaintiffs specifically raised allegations regarding the demand futility holding from the 2009 case in the Complaint. *Id.*

---

[18] This Action was filed as a "demand-excused" case. Plaintiffs alleged they were "excused" from following the Delaware rule requiring them to first communicate their concerns to the Board before filing suit. Per the Delaware rule, Plaintiffs were first required to outline their concerns to the Board (thereby putting it on notice) through the issuance of a pre-suit "litigation demand." Of course, there is an equally well-known exception to the Delaware rule: stockholders of Delaware corporations can allege that issuing a pre-suit demand would be "futile" for various reasons. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). A plaintiff is excused from making pre-suit demand if there is reason to doubt that: (i) a majority of a board's directors are independent or interested; or (ii) the challenged acts are a valid exercise of business judgment. *Id.* In the Action, Plaintiffs alleged they were excused from the pre-suit demand requirement because, *inter alia*, based on the facts alleged, there was reason to doubt that the Board's conduct in awarding 2011 compensation was a presumptively-protected business judgment.

at 138 (excusing demand and holding that that "the discretion of directors in setting executive compensation is not unlimited"); ¶11.[19]

The strength of Plaintiffs' Complaint is underscored by the fact that at least two substantially similar derivative actions brought on demand futility grounds and premised upon allegations of excessive executive compensation, including another "say on pay" case brought on behalf of Cincinnati Bell, Inc. following a negative shareholder vote, were recently sustained. *See NECA-IBEW Pension Fund ex rel. Cincinnati Bell, Inc. v. Cox*, No. 1:11-CV-451, 2011 WL 4383368, at \*4 (S.D. Ohio Sept. 20, 2011) ("*Cincinnati Bell*") (finding "reason to doubt that the directors could make unbiased, independent business judgments" at the pleading stage because "[t]he director defendants are the very same people who approved the pay hikes and bonuses");[20] *Louisiana Mun. Police Emps. Ret. Sys. v. Ritter*, CV-2009-001588 (Ala. Cir. Ct. Jefferson Cty. May 6, 2010) (applying Delaware law and finding that challenged executive compensation decisions created a reasonable doubt as to whether the board's approval was a valid exercise of business judgment), Order attached hereto as Exhibit D.  In addition, Plaintiffs are aware of yet

---

[19] Again, it is Second Circuit federal law, and not Delaware law, which governs the instant fee application.  *See Brautigam*, 2000 WL 1264289 at \*1.  Even if Delaware law applied, however (and it does not), and this Court examined whether the Complaint had a reasonable hope of surviving a motion to dismiss, this critical fact -- the Board's own prior history of overpaying Citigroup's top executives and being held subject to potential liability as a result (*Citigroup*, 964 A.2d at 138) -- distinguishes this Action from all other "say on pay" or other executive compensation cases Defendants will likely cite in their papers, in which pre-suit demand was required.

[20] In *Cincinnati Bell,* as in this Action, after a negative "say on pay" vote, the plaintiff challenged alleged excessive and increased 2010 compensation paid to senior officers despite diminished financial performance, including a \$61.3 million decline in net income and an 18.8% decline in share price.  *Cincinnati Bell,* 2011 WL 4383368, at \*1.  The \$61.3 million decline in net income and the 18.8% decline in the corporation's share price in *Cincinnati Bell* is dwarfed by Citigroup's \$8.25 billion revenue decline in 2011, as well as the one year 44% stock price decline and the five year 95% decline in Citigroup's share price that was suffered by Citigroup stockholders.  *See* Complaint.

another "say on pay" derivative case brought under Delaware law on behalf of Nutrisystem, Inc., that in 2012 survived preliminary objections (the Pennsylvania equivalent to a Fed. R. Civ. P. 23.1 motion to dismiss) on demand futility grounds.  *See Schatz v. Redling, et al.*, No. 11-24985, Court of Common Pleas of Montgomery County, Pennsylvania, Complaint, Preliminary Objections, and Order, attached hereto as Exhibits E, F, and G, respectively.[21]  The strength of Plaintiffs' allegations, and the actions of Plaintiffs' Counsel, severely hamper Defendants' ability to demonstrate the absence of a causal connection between this Action and the resignations of Pandit and Havens, the denial of severance for each of them, and their substantial compensation forfeitures.

Finally, any notion that Plaintiffs and Plaintiffs' Counsel lacked the influence or otherwise were incapable of bringing about the types of remedial measures taken at Citigroup is false.  Plaintiffs' Counsel have in fact "caused" other boards to take very similar steps in similar cases.  For example, in a very recent, similar "say on pay" shareholder derivative action in the U.S. District Court for Eastern District of Pennsylvania, captioned *Wyrick v. Redling, et al.*, Civil Action no. 2:11-cv-05036-PD ("*Nutrisystem*"), certain of Plaintiffs' Counsel were largely responsible for causing the Company to not renew its CEO's employment agreement, which ultimately resulted in the CEO's "resignation."  Importantly, in the stipulation of settlement of the *Nutrisystem* derivative litigation, the defendants admitted that Nutrisystem only took these

---

[21] Plaintiffs' allegations in this Action are stronger than those that survived the pleading stage in the Nutrisystem say-on-pay case.  There, the plaintiffs challenged pay increases granted to Nutrisystem's senior officers for 2010 under a purported pay for performance policy based on "increases in long-term stockholder value" even though Nutrisystem's stock price decreased nearly 30% in 2010 and had plummeted by approximately 70% from 2007 through 2010.  *See* Exhibit E.  Here, Citigroup's pay for performance policy, very similar to Nutrisystem's, was allegedly based on "the long-term best interests of the stockholders," and while the stock price performance at issue in the Nutrisystem case was terrible to be sure, Citigroup's stock price performance at issue in this Action was even worse.  *See* Complaint.

actions after being motivated in substantial part by the filing and pendency of the case.[22]  *See* Stipulation and Agreement of Settlement, dated September 5, 2012, attached hereto at Exhibit H. Likewise, in another "say on pay" derivative case in the U.S. District Court for the Northern District of Ohio, captioned *In re KeyCorp Derivative Litig*., Lead Case No. 1:10-cv-01786-DAP ("*KeyCorp*"), certain of Plaintiffs' Counsel successfully obtained the forfeiture of valuable financial benefits by KeyCorp's CEO.  In the stipulation of settlement of *KeyCorp*, the defendants admitted that these forfeitures were "as a result of the filing, prosecution and settlement of the Action."  *See* Stipulation and Agreement of Settlement, dated March 25, 2011, attached hereto at Exhibit I.  Accordingly, any suggestion that Plaintiffs' Counsel are incapable of causing the types of benefits that are the subject of this Motion is wholly misplaced in light of Plaintiffs' Counsel's own prior experience.

### B.   The Amount of Attorneys' Fees and Expenses Requested Is Fair and Reasonable

Plaintiffs' Counsel seek an award of fees and reimbursement of expenses in the amount of $6 million in the aggregate.  This fee and expense request is equivalent to less than 14% of the value of the financial benefits obtained through the prosecution of these actions for Citigroup and its public shareholders.

#### 1.   Legal Standard

The amount of attorneys' fees to be allowed in corporate representative litigation is a matter left to the sound discretion of the Court.  *Franklin Balance Sheet Inv. Fund*, 2007 WL 2495018, at *6 (citing *Chrysler Corp.*, 223 A.2d at 386).  In determining the amount of an award of attorneys' fees, the Second Circuit considers, *inter alia*: (1) the time and labor expended by

---

[22] Plaintiffs' Counsel respectfully submits that a material portion of the attorneys' fee award ultimately agreed to with the defendants in *Nutrisystem* was a result of this CEO's departure.

counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement;[23] and (6) public policy considerations.  *See*, *e.g.*, *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000).[24]

### 2. The Time and Labor Expended

Plaintiffs' Counsel identified, investigated and vigorously prosecuted this case, expending significant time and expense on an entirely contingent basis.  These efforts included legal and factual research, analyzing all publicly available information relating to Citigroup's past compensation policies, as well as the compensation practices of comparable companies, working with a compensation expert, filing the Complaint, and drafting, but not filing in light of Citigroup's announcements, responses to Defendants' motion to dismiss.

These legal services were of high quality and could only have been rendered by attorneys who are highly experienced at prosecuting shareholder representative litigation, as are Plaintiffs' attorneys here.  *See* Compendium of Lodestar Declarations and Firm Resumes (the "Compendium") attached hereto as Exhibit J.  As detailed in the Compendium, Plaintiffs' Counsel have expended approximately 643.5 collective hours in the prosecution of the Action (which represents a lodestar of $277,663.50),[25] worked diligently to achieve the desired result,

---

[23] Plaintiffs' Counsel respectfully submits that for purposes of evaluating this Motion, the Court should treat the "settlement" as being functionally equivalent to the actions taken by Defendants, which have mooted Plaintiffs' Action.

[24] The Court may also consider similar counsel fee awards in its determination of the amount to be awarded herein.  *See Dow Jones & Co. v. Shields*, No. 184, 1991, 1992 WL 44907, at *3 (Del. Ch. Jan. 10, 1992); *see also In re Anderson Clayton Shareholders Litig.*, CIV.A. 8387, 1988 LEXIS 127, *12 (Del. Ch. Sept. 19, 1988).

[25] This does not include time spent by Ryan & Maniskas LLP, which filed the initial complaint by plaintiff Silvester Sciuto in April 2012, and has otherwise devoted time to the prosecution of this Action.

and have advanced or incurred in excess of $8,950.25 in unreimbursed costs and expenses.[26]   *See*

Exhibit J.   Without judicial intervention, Plaintiffs' Counsel stands to be uncompensated for any

of these efforts.   *See* Exhibit J.[27]

### 3.   Public Policy Considerations

Public policy dictates that in order for skilled lawyers to undertake complex shareholder

derivative cases on a wholly contingent basis, they must be adequately compensated when they

produce an unusually positive result, such as the result caused by Plaintiffs' Counsel in the

---

[26] To the extent that this Court takes issue with Plaintiffs' Counsel's "lodestar," Plaintiffs' Counsel respectfully submits that they should not be penalized for prosecuting the Action in an extremely efficient manner.  *See, e.g., Dottenheim,* 7 F.R.D. at 197.  The Second Circuit has expressly rewarded counsel for plaintiffs for efficiently prosecuting cases, particularly in light of the "contingent risk of litigation."  As stated in the seminal case of *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) *abrogated by Goldberger*, 209 F.3d at 43:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

[27] Moreover, Plaintiffs' Counsel's fee request is reasonable when compared to the awards by courts from many other jurisdictions.  These courts have awarded fees representing lodestar multiples or hourly rates similar to, or higher than, that sought by Plaintiffs' Counsel here. *See*, *e.g.*, *In re Genentech, Inc. S'holders Litig.*, No. 3911-VCS (Del. Ch. July 9, 2009) (awarding $24.5 million fee, representing approximately 11.3 times the overall lodestar, and an average hourly rate of approximately $5,445); *The Stop & Shop Supermarket Co., et al. v. Smithkline Beecham Corp.,* No. Civ. A. 03-4578, 2005 U.S. Dist. LEXIS 9705, *60-61 (E.D. Pa. May 19, 2005) (the court approved fees of $20 million representing a lodestar multiplier of 15.6); *Muchnick v. First Fed. Sav. & Loan Assoc.*, Civ. A. No. 86-1104, 1986 U.S. Dist. LEXIS 19798, *10-11 (E.D. Pa. Sept. 30, 1986) (approving a fee request of $250,000 from a settlement fund of between $4 million and $6.8 million, resulting in a lodestar multiplier of 8); *Cosgrove v. Sullivan,* 759 F. Supp. 166, 167, 169 (S.D.N.Y. 1991) (approving fee of $1 million, or 1% of medicare benefits paid by HHS pursuant to the settlement; the fee representing an 8.75 multiplier of the lodestar of $114,398.00); *Weiss v. Mercedes-Benz of N. America*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarded fee of $ 11,250,000, or 15% of the present settlement value of $75,000,000, representing a lodestar multiplier of 9.3); *Glendora Cmty. Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465 (Ct. App. 2nd Dist. 1984) (the fee award of $656,028 was 12 times the lodestar).

Action.  The contingency factor is based on elementary considerations of fairness and justice. As the Fourth Circuit explained in *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967), "[t]he effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services."  Plaintiffs' Counsel undertook this litigation on a wholly contingent fee basis, with the understanding that the firms involved would devote substantial work and resources to the Action but would receive no compensation, or even reimbursement of expenses, absent a successful result.  This Court has succinctly stated the important public policy reasons for providing a meaningful financial incentive, in the form of a premium over their standard hourly rates, for capable counsel to undertake cases such as this Action:

> It unquestionably is true that without able lawyers handling these matters not only do some of them go unprosecuted, but the big difference in my experience is in the amount obtained and you don't get the highest recovery and when you are paying at the low end of the scale of fee recovery in contingent actions, it seems to me that I as the protector of the class, can fairly say, and honestly say, that I believe it is in the class's best interests - of this class and of future classes yet unknown - to pay this kind of money for these kinds of benefits.

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 487 (S.D.N.Y. 1998) (quoting the transcript of *In re Pepsico Sec. Litig.*, No. 82-8403, 1985 U.S. Dist. LEXIS 20372 (S.D.N.Y. Apr. 26, 1985)); *see also In re F&M Distribs., Inc. Sec. Litig.*, No. 95-CV-71778, 1999 U.S. Dist. LEXIS 11090, at *18 (E.D. Mich. June 29, 1999) ("Society's stake in rewarding attorneys who can produce such benefits in complex litigation … counsels in favor of a generous fee, as does the realization that they undertook this case on a contingent fee basis, which required them to fund all of the significant litigation costs while facing the risk [of] a rejection of their clients' claims on the merits.").[28]

---

[28] "The Court is well aware that there are numerous contingent cases such as this where plaintiff's counsel, after investing thousands of hours of time and effort, have received no

Here, the legal hurdles faced by Plaintiffs' Counsel were substantial. Although there was widespread criticism in the press and elsewhere of Citigroup's compensation practices (particularly in light of the Company's failed Vote), only Plaintiffs' Counsel here were willing to invest the resources and expertise to develop the legal strategy that finally brought Defendants into Court, and challenged Citigroup's compensation practices as constituting a breach of Defendants' fiduciary duties. Accordingly, the proposed fee and expense award appropriately compensates Plaintiffs' Counsel for undertaking the risk of non-payment and serves the goal of encouraging competent counsel to represent plaintiffs on a contingent basis in this type of fiscally and socially important litigation.

**4.    The Standing and Efforts of Plaintiffs' Counsel**

Plaintiffs' Counsel are seasoned and well-known practitioners in the highly-specialized field of corporate governance and shareholder litigation. *See* Exhibit J. Moreover, Plaintiffs' Counsel faced numerous adversaries in the Action, represented by high-quality law firms with extensive experience in complex litigation. The standing and reputation of counsel for the parties, in addition to Plaintiffs' Counsels' well-demonstrated abilities and the results achieved, support the fairness and reasonableness of the requested fee and expense award.[29]

---

compensation whatsoever. Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award. In evaluating [the contingent fee] factor the Court will not ignore the pecuniary loss suffered by plaintiff's counsel in other actions where counsel received little or no fee." *Ressler v. Jacobson*, 149 F.R.D. 651, 656-57 (M.D. Fla. 1992) (citations omitted).

[29] Pursuant to this Court's December 19, 2012 Order, Plaintiffs were afforded the opportunity herein to brief the issue of whether discovery is necessary in the instant Action. As set forth above, Defendants have the burden of showing that the actions of Plaintiffs' Counsel were not a cause of the benefits obtained by the Company. Plaintiffs respectfully submit that absent discovery practice, Defendants are entirely incapable of meeting this burden. Indeed, courts have encouraged discovery to proceed in determining the merits of a fee application to ensure that a ruling is made with the benefit of a fully-developed evidentiary record. *See, e.g., Koppel,* 743 F.2d at 135 (recognizing that even where there was the presumption that the lawsuit caused

### 5.   <u>The Benefits Derived Through The Litigation</u>

Even though not a specific factor outlined in *Goldberger*,[30] many courts have stated that the benefits achieved by the action should be accorded the greatest weight in determining the fee to be awarded.  *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-150 (Del. 1980); *see also In re Golden State Bancorp Inc. S'holders Litig.*, Civ.A. 16175, 2000 WL 62964 (Del. Ch. Jan. 7, 2000); *In re MAXXAM Group, Inc. S'holders Litig.*, No. 8636, , 1987 WL 10016, *11 (Del. Ch. Apr. 16, 1987) (the "benefits achieved by the litigation constitute the factor generally accorded the greatest weight" in determining the fee to be awarded); *In re Anderson Clayton S'holders Litig.*, 1988 LEXIS 127; *Smith v. Van Gorkom*, Civ. A. 6342, 1985 WL 22040 (Del. Ch. Oct. 11, 1985); *Joseph v. Shell Oil Co*., Civ. A. 7450, 1985 WL 150466 (Del. Ch. Apr. 22, 1985).  In this Action, Plaintiffs and Plaintiffs' Counsel's efforts have resulted in an estimated $43 million benefit for the Company and its shareholders.

Plaintiffs' Counsel's request of a fee award in the amount of $6 million, which represents only 14% of the approximately $43 million recovered for the Company, is eminently reasonable in light of the significant benefits derived for the Company.  Courts, which have been called upon to consider fee awards in connection with shareholder litigation, have utilized a

---

the defendants to take action that mooted the suit, an evidentiary hearing was necessary because defendants disputed that the lawsuit motivated them to change their conduct); *Barton v. Drummond Co.,* 636 F.2d 978 (5th Cir. 1981) (holding that it is erroneous to deny a motion for attorneys' fees in this context without conducting an evidentiary hearing, and ordering that an evidentiary hearing be held regarding causation and other issues); *see also Alaska Electrical Pension Fund v. Brown,* 941 A.2d 1011, 1016 (Del. 2007) ("[G]iven the presumption of causation, it is defendants' burden to establish that the pending Alaska lawsuit did not in any way contribute to the higher price.  On remand, all parties will have the opportunity to address this issue after appropriate discovery").

[30]  Plaintiffs' Counsel respectfully submits, however, that the "benefits derived through the litigation" is essentially an amalgamation of three of the *Goldberger* factors: (1) the magnitude and complexities of the litigation; (2) the risk of litigation; and (3) the requested fee in relation to the settlement.

"percentage of the benefit" approach in similar cases involving quantifiable benefits and approved awards well in excess of, and comparable to, the percentage Plaintiffs' Counsel seek here. *See*, *e.g.*, *In re Intek Global Corp. S'holders Litig.*, C.A. No. 17207, Strine, V.C. (Del. Ch. Apr. 24, 2000) (awarding an attorneys' fee equal to 33% of the quantifiable portion of the benefit achieved); *Thorpe v. CERBCO, Inc.*, Civ. A. 11713, 1997 WL 67833, at *6 (Del. Ch. Feb. 6, 1997)*, aff'd*, 1997 Del. LEXIS 438 (1997) (awarding attorneys' fees of 33% of payment made in a derivative lawsuit); *In re Oppenheimer Capital Unitholders Litig.*, C.A. No. 16022, Lamb, V.C. (Del. Ch. Oct. 20, 1998) (awarding 25%); *Behrens v. Triathlon Broadcasting Co.*, C.A. No. 16560, Jacobs, V.C. (Del. Ch. Aug. 29, 2000) (awarding 23.5%); *Franklin Balance Sheet Inv. Fund v. Crowley*, C.A. No. 888-VCP, 2007 WL 2495018 (Del. Ch. August 30, 2007) (awarding 15% of the portion of the benefit created by the plaintiffs' litigation, and 5% of another portion – the "excess benefit" – that was not solely attributable to the litigation); *Baupost Ltd. P'ship 1983 A-1 v. Providential Corp*., CIV. A. 12978, 1993 WL 401866, at *3 (Del. Ch. Sept. 3, 1993) (upholding a fee award of 13.04% of a settlement award in a derivative lawsuit as "well within the range of fee awards made by this court").

In sum, based on the range of awards in other cases and on the magnitude of the approximately $43 million corporate benefit achieved, Plaintiffs' Counsel are well-within reason in seeking a fee award of $6 million, or less than 14% of the aggregate value of the financial benefits to Citigroup created, at least in part, through this Action.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Counsel respectfully requests that this Court award Plaintiffs' Counsel a fee award in the amount of $6 million.  Alternatively, should this Court be inclined to deny Plaintiffs' Counsel's fee application at this juncture, or determine that it is

unable to rule upon the issue of causation absent a fully-developed evidentiary record, Plaintiffs'

Counsel respectfully requests that this Court permit Plaintiffs' Counsel to engage in limited

discovery.

Dated:  January 25, 2013

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

_s/Curtis V. Trinko_____
CURTIS V. TRINKO
JENNIFER E. TRAYSTMAN
C. WILLIAM MARGRABE
16 West 46th Street, 7th Floor
New York, NY 10036
Telephone:  (212) 490-9500
Facsimile:  (212) 986-0158

Liaison Counsel for Plaintiffs

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
JOSEPH M. PROFY
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**ROBBINS ARROYO LLP**
BRIAN P. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
KEVIN S. KIM
600 B Street, Suite 1900
San Diego, CA 92101
Phone: (619) 525-3990
Fax: (619) 525-3991

Co-Chairs of Executive Committee for
Plaintiffs

24

**RYAN & MANISKAS LLP**
KATHARINE M. RYAN
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516
Facsimile: (484) 450-2582

Additional Counsel for Plaintiffs