UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :   Lead case: 12 Civ. 3114
IN RE CITIGROUP SHAREHOLDER                                 :           (JPO)
DERIVATIVE LITIGATION.                                      :
                                                            :   <u>OPINION & ORDER</u>
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

This is a consolidated "say on pay" shareholder derivative action on behalf of nominal defendant Citigroup Inc. ("Citigroup") against Citigroup's Board of Directors ("the Board") and certain former and current Citigroup executives. Asserting claims under Delaware law and the Securities Exchange Act of 1934, the Complaint alleges that the Board's authorization of pay increases for, *inter alios*, Defendants Vikram Pandit and John Haven, was in violation of the Board's pay-for-performance executive compensation policy. After voluntarily dismissing their action, Plaintiffs now move for attorney's fees in the amount of $6 million. For the reasons that follow, Plaintiffs' motion is denied.

**I.    Background**

This case stems from an advisory proposal on Citigroup's 2011 executive compensation program, which was rejected by a majority of Citigroup's shareholders in a "say on pay" proxy vote on April 17, 2012. (Dkt. No. 29, ("Compl.") at ¶ 7.) The vote was a major blow to the Board, because, as one journalist noted, it made Citigroup "the first big bank to see a pay plan get a thumbs down." (Dkt. No. 55 ("Eaton Decl."), Ex. 4.)

Two days later, on April 19, 2012, Plaintiffs initiated this action. (Dkt. No. 1.)[1] The Complaint alleges that the Board had approved excessive compensation awards for 2011 and had

---

[1] More specifically, the first suit, *Moskal v. Pandit, et al.*, No. 12 Civ. 3114, was filed on April 19, 2012. *Sciuto v. Pandit, et al.*, No. 12 Civ. 3422, and *Kenny v. Pandit, et al.*, No. 12 Civ. 3453, were initiated shortly thereafter. The Court consolidated the three actions on July 12,

1

caused Citigroup to issue a proxy statement that was false and misleading.[2]  Specifically, the Complaint focuses on the "*$54 million*" in compensation granted to "Citigroup's five highest-paid officers," Vikram Pandit, John Gerspach, John Havens, Brian Leach, and Manual Medina-Mora.  (*Id*. at ¶ 47 (emphasis in original).)[3]

Defendants moved to dismiss the action on October 11, 2012.  (Dkt. No. 32.)  On October 16, 2012, Pandit and Havens resigned from their respective positions in the Company.  On October 19, 2012, Plaintiffs' counsel sent a letter to counsel for Defendants, Mary Eaton, which stated in part:

> As you know, in the [Citigroup derivative action], Plaintiffs allege that certain current and former members of Citigroup's Board . . . breached their fiduciary duties as a result of the improper and egregious authorization and receipt of significant 2011 pay raises, and in particular, the Board's authorization of increases for, among others, defendants [Pandit and Havens] . . . .
>
> On October 16, 2012, in a surprise announcement, it was disclosed for the first time that defendant[s Pandit and Haven] had abruptly "resigned" . . . .  Notably, a[n] October 16, 2012 *Forbes* article entitled "Citigroup Loses Top Two Executives, Including Pandit" speculated that Pandit's resignation "may have been as a result of disagreement over changes to Mr. Pandit's pay package that investors may be insisting on during the inevitable consultation

---

2012.  (Dkt. No. 7.)  Plaintiffs filed an amended consolidated complaint on August 27, 2012.  (Compl.)

[2] The Complaint contains four causes of action.  The first three claims, including the two breach of fiduciary duty claims, are state law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  By contrast, the fourth claim, which alleges that Defendants issued a false and misleading proxy statement, was brought under Section 14(a) of the Securities and Exchange Act of 1934.

[3] The Complaint contains a copy of the summary chart appearing in the Compensation Discussion and Analysis of the Proxy Statement, which explains that the executives at issue received the following amounts of compensation in 2011: $15 million for Pandit, $6 million for Gerspach, $13 million for Havens, $9 million for Leach, and $11 million for Medina-Mora.  For each of these executives, the above-stated awards were composed of base salary, cash bonus, deferred stock, and deferred cash.

> following on from the negative Say on Pay vote," which is the same negative vote challenged in the Action. . . .
>
> Since these "resignations" were announced, there has been rampant speculation in the financial media that both Pandit and Havens will soon become the recipients of lucrative "exit packages" or "separation plans." . . . To the extent that any such financial benefit may have already been provided to Pandit and/or Havens, we hereby demand that these benefits be returned to the Company immediately. To the extent that no such benefits have been provided to date, we demand that the Board enter into "freeze" or standstill agreements with Pandit and Havens forthwith, holding any such benefits in abeyance until the resolution of the Action.
>
> Please indicate to us, in writing, whether Pandit and/or Havens and the Board are willing to enter into the "freeze" or standstill agreements . . . no later than 5:00 P.M. (Eastern) on Monday, October 22, 2012. If [they] are unwilling to agree to enter into such agreements, we will seek all appropriate relief from the Court, including additional damages and potentially injunctive relief.
>
> To be clear, we are providing this letter . . . to you at this juncture as a professional courtesy prior to Court intervention. As you know, in this Action, Plaintiff allege that they were not required under Delaware law to issue a "pre-suit demand" on the Board. . . . This letter is not a waiver of [Plaintiffs'] right to allege and argue "demand futility" in the Action . . . .

(Pls.' Mem., Ex. A.)

On November 9, 2012, Citigroup filed a Form 8-K with the Securities and Exchange Commission ("the 8-K"). (Pls.' Mem., Ex. C.) The 8-K provided in part:

> Subject to the conditions set forth in the Agreements, the [Board] has granted to Messrs. Pandit and Havens $6,653,444 and $6,792,222 as incentive awards, respectively, for their significant contributions to Citigroup during 2012 . . . .
>
> Each of Messrs. Pandit and Havens will forfeit or continue to vest in awards previously granted to them, as required under the terms of those awards. Specifically, under the terms of the long-term performance retention granted to him in May 2011, Mr. Pandit will no longer have the opportunity to earn the profit sharing, unvested stock option, or deferred stock components of the retention award. Under the terms of the long-term performance retention awards

3

> granted to him in February 2011, Mr. Havens will no longer have the opportunity to earn the profit sharing component of his retention award and he will no longer have the right to vest in a portion of his stock option component; in addition, he will forfeit other awards.
>
> Mr. Pandit will continue to vest in deferred stock and deferred cash incentive awards . . . that were awarded as part of the regular annual incentive awards for performance in 2011 . . . .
>
> Similarly, Mr. Havens will continue to vest in deferred stock and deferred cash incentive awards . . . that were awarded as part of the regular annual incentive awards for performance in 2011 . . . .

(*Id.*) The 8-K also contained copies of the separation agreements between Citigroup and both Pandit and Havens. (*Id.*)

As per this Court's order, Plaintiffs' opposition to Defendants' motion to dismiss was due thirty days after the filing of Defendants' motion. (Dkt. No. 7.) On November 13, 2012, Plaintiffs requested a thirty-day extension, in order to "carefully and thoroughly evaluate the impact of the Company's recent actions upon the claims asserted in the Action." (Dkt. No. 37.) That request was granted on November 20, 2012. (*Id.*) During a telephonic conference on November 28, 2012, Plaintiffs informed the Court that they intended to voluntarily dismiss their lawsuit. On January 2, 2013, this Court granted Plaintiffs' voluntary dismissal of this consolidated action. (Dkt. No. 46.) Plaintiffs never opposed Defendants' motion to dismiss.

On January 25, 2013, Plaintiffs moved for attorney's fees. (Dkt. No. 53 ("Pls.' Mem.").) Defendants opposed on February 25, 2013. (Dkt. No. 54 ("Defs.' Opp'n.").) Plaintiffs replied on March 15, 2013. (Dkt. No. 56.).

## II. Discussion

"Under the bedrock principle known as the American Rule, each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (internal quotation marks, citations, and alterations

omitted).  There are, however, exceptions to this rule.  One such exception is the so-called "common benefit" doctrine, which applies where an action "confers a *substantial* benefit on the members of an ascertainable class . . . ."  *Rodonich v. Senyshyn*, 52 F.3d 28, 31-32 (2d Cir. 1995) (emphasis added, internal citations and quotation marks omitted); *see also United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) ("[C]ourts have long recognized the 'common corporate benefit' doctrine as a basis for the reimbursement of attorneys' fees and expenses in corporate litigation." (citation omitted)).

The common-benefit doctrine often applies "in shareholder derivative actions, to award fees indirectly against other shareholders benefiting from the law suit by taxing the nominal corporate defendant."  *Christensen v. Kiewit–Murdock Inv. Corp.*, 815 F.2d 206, 211 (2d Cir. 1987).  Under Delaware law, this exception applies only where "the suit was meritorious when filed; action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and the resulting corporate benefit was causally related to the lawsuit."  *Allied Artists Pictures Corp. v. Barron*, 413 A.2d 876, 878 (Del. 1980); *see also United Vanguard Fund, Inc.*, 693 A.2d at 1079 (same).  By contrast, under the federal law of this circuit, the exception applies irrespective of whether the suit has merit, as long as the litigation conferred a benefit on an ascertainable class of shareholders and/or the company.  *Koppel v. Wien*, 743 F.2d 129, 135 (2d Cir. 1984); *see also Brautigan v. Bratt*, No. 98 Civ. 9060 (JSM), 2000 WL 1264289, at *1 (S.D.N.Y. Sept. 5, 2000) ("[U]nlike in some other circuits, in the Second Circuit the plaintiff is not required to show that the complaint had sufficient merit to survive a motion to dismiss before the plaintiff can recover fees where a common fund case has been mooted by the

defendant's corrective action." (citing *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996))).[4]

### A.   Mootness

Where a suit has become moot, "the burden of proof as to causation—for purposes of determining the plaintiffs' eligibility for an award of attorneys' fees—shifts from the plaintiff to the corporation."  *In re Pfizer Shareholder Derivative Litig.*, 780 F. Supp. 2d 331, 335 (S.D.N.Y. 2011) (citing *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989)); *see also Savoie*, 84 F.3d at 57 ("When the defendant has taken action to moot the lawsuit, defendant bears the burden of proof to establish the absence of a causal connection between the lawsuit and the defendant's action." (citing *Koppel*, 743 F.2d at 135).  Otherwise, "the burden of showing causation lies with the shareholder seeking to recover fees rather than the corporation." *In re Pfizer*, 780 F. Supp. 2d at 335 (citations omitted).  Thus, at the outset, the Court must determine whether this action have been mooted, as Plaintiffs contend.

A suit is not mooted unless it "cures the alleged wrong to the corporation's benefit . . . ." *Barron*, 413 A.2d at 880; *see also In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1446 (N.D. Cal. 1994) (explaining that the mootness exception applies "when the beneficial corporate action completely remedies the wrong complained of and thereby *moots* the derivative action"

---

[4] The parties hotly dispute whether federal common law or Delaware law applies to this petition for attorney's fees.  *Compare Absolute Recovery Hedge Fund LP v. Gaylord Container Corp.*, 185 F. Supp. 2d 381, 386 & n.15 (S.D.N.Y. 2002) (Delaware law applicable to plaintiffs' petition for attorney's fees stemming from common law breach of fiduciary duty claim, while federal law applies to claim under Section 14(e) of the '34 Act), *with Brautigan*, 2000 WL 1264289, at *1 (holding that in non-diversity cases, federal law applies to application for attorney's fees).  The Court agrees with Defendants that, as to the three state law claims, Plaintiffs cannot be awarded attorney's fees unless they can show that this action had merit.  *See Felder v. Casey*, 487 U.S. 131, 151 (1998) (holding that state substantive law applies under *Erie* regardless of whether a federal court "exercises diversity or pendent jurisdiction over state law claims").  In any event, for the reasons explained below, Plaintiffs' counsel are not entitled to fees under either regime.

(emphasis in original, citations omitted)); Black's Law Dictionary (9th Ed. 2009) (defining "moot case" as "[a] matter in which a controversy no longer exists; a case that presents only an abstract question that does not arise from existing facts or rights").

Here, Plaintiffs' Complaint contains four causes of action against various directors and/or officers of Citigroup, all of which primarily concern "the Board's recent authorization of excessive 2011 compensation for executives who have presided over extremely disappointing company performance." (Compl. at ¶ 2; *see also id. at* ¶¶ 35-36, 43, 47.)  According to the Complaint, the $54 million in 2011 executive compensation among the five executives was divided as follows: Pandit earned $15 million; Gerspach was awarded $6 million; Havens was awarded $13 million; Leach was awarded $9 million; Medina-Mora was awarded $11 million.

Despite Plaintiffs' insistence to the contrary, Plaintiffs' claims seeking damages and/or disgorgement of excessive 2011 compensation have not been mooted.[5]  *None* of the five above-named persons has paid back any of the $54 million at issue in the Complaint.  Gerspach, Leach, and Medina-Mora remain Citigroup officers, and their 2011 compensation has not been affected in any way.  Thus, the portions of the claims concerning the $26 million of compensation received by these individuals have not been mooted in any fashion.  Likewise, while Pandit and Havens have forfeited certain *long-term retention awards* – specifically, "profit sharing [under the Key Employee Profit Sharing Plan ("KEPSP")], unvested stock options, or deferred stock components of the retention award"—it is undisputed that neither has forfeited his *annual compensation* for 2011.[6]  In other words, Pandit and Havens have *not* returned to Citigroup any

---

[5] Likewise, Plaintiffs have not obtained any relief for the two causes of action that challenged the compensation-related disclosure in Citigroup's Proxy Statements.  Those claims are therefore not mooted either.

[6] The Complaint does not even mention the "unvested stock options" or "deferred stock components" provided to Pandit and Haven.  And while the Complaint does discuss the KEPSP at length (*see* Compl. at ¶¶ 55-62), it does not appear to challenge the KEPSP as excessive, but

7

of their portions of the $54 million at issue in this case. If their annual compensation in 2011 was indeed excessive, nothing that has happened since the filing of the Complaint has remedied that wrong. *Accord In re Oracle*, 852 F. Supp. at 1447 ("Oracle's changes in corporate policy in this case did not moot derivative plaintiffs' complaints of fraud, insider trading and breach of fiduciary duty by the individual defendants. Corporate policy changes would remedy only prospective injury and not past damages Oracle suffered and thus would not moot the derivative claims here. Derivative counsel have pointed to no Delaware cases supporting burden-shifting in the absence of a completely moot derivative plaintiffs' case. Neither have derivative counsel proffered a basis for the court to extend the 'mootness test' beyond that which the Delaware courts have heretofore developed."); *Grimes v. Donald*, 791 A.2d 818, 822 (Del. Ch. 2000) (plaintiff not entitled to recover fees because his claim was not rendered moot).[7]

---

rather seems to assert that "Defendants issued false and misleading statements drastically understating the compensation defendant Pandit stood to receive under the KEPSP." (*Id.* at ¶ 55.) In any event, as is explained above, the majority of the Complaint concerns annual compensation, not the KEPSP, and these allegations have not been mooted.

[7] Plaintiffs rely on a string of cases, which together affirm the unremarkable proposition that a case is considered mooted even where the benefit conferred is not exactly the same as the benefit sought by the Complaint. *See Howie v. Elite Info. Grp., Inc.*, No. 00 Civ. 462, 2001 WL 753803, at *2 (D. Del. June 29, 2001) (explaining that a case is mooted "where a defendant corporation takes steps to . . . moot a case and in so doing produces a benefit similar to that sought by the shareholders' litigation"). Yet the problem here is not simply that the *benefit* sought by Plaintiffs is slightly different from the benefit received—i.e., that the Complaint seeks an injunction but the complaint was mooted by some other means—but that the "alleged wrong[s]" raised in the Complaint simply have not been "cure[d]". *Barron*, 413 A.2d at 880.

A cursory glance at several of the cases cited by Defendants makes plain the distinction. Plaintiff relies on *United Vanguard Fund, Inc. v. TakeCare, Inc.*, where the Delaware Chancery Court determined that a claim that a proposed merger was at an unfairly low price was mooted after the stock was sold at a higher price, despite the fact that the complaint sought injunctive relief. 727 A.2d 844, 846 (Del. Ch. 1998). There, the exact benefit sought by the complaint—injunctive relief—was not conferred on the shareholders, but the *wrong* alleged by the Complaint—that the stock price was too low—was indeed rendered moot. Similarly, Plaintiffs rely on *Koppel v. Wien*, which concerned a suit to amend a partnership agreement. In *Koppel*, however, the action was indisputably mooted when the defendants decided not to pursue the partnership amendment. 743 F.2d at 132. It is worth noting, moreover, that in *Koppel*, it was the

8

Plaintiffs' claims therefore have not been rendered moot.

B.     **Causal Connection**

Because Plaintiffs' claims are not moot, the burden falls on Plaintiffs to demonstrate that their actions have secured a substantial benefit for Citigroup and its shareholders.[8]  Plaintiffs argue that "Plaintiffs' Counsel were, at the very least, a partial cause of Pandit's and Havens' sudden 'resignations,' and the Board's subsequent decision to acquiesce to Plaintiffs' demand that the Company deny severance and rescind 2011 payments made to the aforementioned executives." (Pls.' Mem. at 2.)  This contention is both unsupported and farfetched.  Indeed, it reflects a *post hoc ergo propter hoc* fallacy, as changes to executive compensation were already underway when the suit was filed.[9]  Plaintiffs filed this suit immediately after Citigroup conducted a "say on pay" vote.  But even before the suit was filed, Citigroup had already made clear that a major shakeup in executive compensation was forthcoming.  For example, shortly after the vote, former Citigroup Chairman Richard Parsons publicly stated that he considered the vote a "serious matter" and that the Board would take steps to "fix" the Company's executive compensation program.  (*See* Eaton Decl., Ex. 2-3.)  Moreover, after the vote but before this action was filed, the Board agreed to engage an outside consultant to address the executive

---

*defendants*, not the plaintiff, who moved to dismiss the case as moot.  Indeed, the plaintiffs in *Koppel* strenuously *objected* to the dismissal of the action.  *Id*.

In short, Plaintiffs have cited no cases, nor does this Court know of any, holding that a derivative action should be considered moot where the exact wrong alleged in the Complaint has not been, and could feasibly still be, redressed.

[8] Even if Plaintiffs' action were not moot, Plaintiffs' claim for attorney's fees would nonetheless fail, as it is simply inconceivable that this action in any way caused Citigroup's corrective measures.  Of course, the fact that Plaintiffs' claims are have not be mooted renders Plaintiffs' theory that the actions taken by Citigroup were in response to the lawsuit all the more unlikely.

[9] Indeed, the Court is inclined to believe that Plaintiffs' theory of events reversed the cause and effect: it is not that Plaintiffs' action caused the reforms, but that indicia of the reforms to come spurred Plaintiffs to bring this suit.

9

compensation programs in light of shareholder concerns.  (Eaton Decl., Ex. 23.)  Indeed, during these discussions—and before Plaintiffs' suit had been filed—Mr. Pandit himself acknowledged that Citigroup needed to "take seriously the results of the Say-on-Pay vote" in considering future executive compensation.  (*Id.*)  It was only after these developments that Plaintiffs filed this suit, knowing full well, as one article on the say-on-pay vote put it, that while the "vote is non-binding . . ., [i]gnoring shareholders' wishes could put Citi directors on the hot seat . . . ."  (Eaton Decl., Ex. 4.)  Plaintiffs' own Standstill Letter quotes from a *Forbes* article which speculates that Pandit's resignation may well have stemmed from the "*inevitable* consultations following on from the negative Say on Pay vote."  (Standstill Letter at 2 (emphasis added); *see also* Eaton Decl., Ex. 4 (noting that both Parson and Citi's spokesperson "promise[d] that the board w[ould] consult with shareholders").)  In other words, shareholder pressure, not the lawsuits at issue in this action, was the cause of Citigroup's policy changes.

This is particularly clear given the unlikelihood of Plaintiffs' success in these lawsuits.  Plaintiffs took the position in this litigation that they were excused from making a pre-suit demand on the Board on the ground that shareholders rejected the Board's executive compensation proposal.  But the vast weight of authority—both now and at the time this suit was being litigated—suggests that plaintiffs should not be excused from making a demand on the board where the shareholders reject proposed executive compensation through a say-on-pay vote.  *See, e.g., Raul v. Rynd*, No. 11 Civ. 560, 2013 WL 1010290, at *10 (D. Del. Mar. 14, 2013) ("[T]he Board's failure to change course in light of the say-on-pay vote does not give rise to a substantial likelihood of personal liability, nor demonstrate that the Board would have been unable objectively to evaluate a demand to bring suit."); *Swanson v. Well*, No. 11 Civ. 2142, 2012 WL 4442795, at *7 (D. Colo. Sept. 26, 2012); *Laborer's Local v. Intersil*, 868 F. Supp. 2d 838, 849 (N.D. Cal. 2012); *Plumbers Local No. 137 Pension Fund v. Davis*, No. 11 Civ. 633,

10

2012 WL 104776, at *5-8 (D. Or. Jan. 11, 2012); *Teamsters Local 237 Additional Sec. Benefit Fund v. McCarthy*, 2011 WL 4836230, at *5 (Ga. Sup. Ct. Sept. 16, 2011); *see also* 15 U.S.C. § 78n-1(c) (explaining that a say-on-pay vote "may not be construed . . . to create or imply any change to the fiduciary duties of such issuer or board of directors" or "to create or imply any additional fiduciary duties for such issuer or board of directors").[10]

In sum, it not plausible that this action caused the Board to terminate Pandit and Haven and to alter their compensation, particularly given that (1) the Board had already undergone the expense of filing a motion to dismiss; (2) the motion was likely to succeed; and (3) the Board had no reason to believe that the actions taken would end this litigation.[11]

### C. The Standstill Letter

Plaintiffs also contend that they are entitled to attorney's fees for writing the Standstill Letter. This argument is similarly unpersuasive.

To the extent that Plaintiffs contend that Defendants have the burden of demonstrating

---

[10] Plaintiffs direct the Court to *NECA-IBEW Pension Fund ex rel. Cincinnati Bell, Inc. v. Cox*, No. 11 Civ. 451, 2011 WL 4383368, at *4 (S.D. Ohio Sept. 20, 2011), a say on pay case holding that demand was futile when all directors who had approved the challenged compensation were named as defendants. However, the *Cincinnati Bell* court was applying Ohio law, and courts applying Delaware law have universally distinguished *Cincinnati Bell* on this ground. *See Raul*, 2013 WL 1010290, at *11 (collecting cases).

[11] In their brief, Plaintiffs contend that it would be "wholly misplaced" to argue that derivative suits such as this one "are incapable of causing the types of benefits that are the subject of this Motion." (Pls.' Mem. at 17.) The Court does not question that derivatives suits can have real effects on corporate governance, or that plaintiffs' attorneys should be compensated where derivatives actions confer a benefit on the corporations they target. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966) ("[D]erivative suits have played a rather important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves."); *see also In re Fuqua Indus., Inc. Shareholder Litig.*, 752 A.2d 126, 133 (Del. Ch. 1999) ("Our legal system has privatized in part the enforcement mechanism for policing fiduciaries by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs. In so doing, corporations are safeguarded from fiduciary breaches and shareholders thereby benefit."). The Court simply does not conclude that any such benefit was conferred through this litigation.

that the Standstill Letter did render a benefit to Citigroup, the Court disagrees. None of the relief sought by the Standstill Letter appears in the Complaint, despite Plaintiffs' having had ample opportunity to amend. As Judge Rakoff has recently noted, the argument that "Delaware Courts would extend th[e] burden-shifting framework to parties who took measures other than filing and prosecuting a lawsuit" defies both "law [and] logic . . . . To hold otherwise would be an open invitation for non-parties to engage in frivolous efforts at garnering an undeserved share of attorneys' fees in any shareholder derivative settlement, no matter how remote their connection to the substance of the litigation." *In re Pfizer*, 780 F. Supp. 2d at 335.

Plaintiffs have also failed to demonstrate a causal connection between any corporate benefit and the Standstill Letter. Quite the contrary, the notion that any causal connection exists is simply implausible. Plaintiffs' counsel sent Defense counsel the Standstill Letter on October 19, 2012, warning that, unless the Board agreed to "freeze" Pandit and Havens' exit packages by October 22, 2012 at 5:00 p.m., "we will seek all appropriate relief from the Court, including additional damages and potentially injunctive relief." (Standstill Letter at 2.) But October 22, 2012 came and went, and Plaintiffs did not amend their Complaint or seek any additional relief from this Court. Under these circumstances, it is impossible to conclude that the Standstill Letter somehow was the cause of the decision to rescind their exit packages. And again, given that, as the Standstill Letter notes, Pandit and Haven were likely pushed out as a result of the say-on-pay vote, it is not at all surprising that they were not handed lucrative exit packages on their way out the door.[12]

---

[12] Moreover, Plaintiffs have cited no cases suggesting that a party may be awarded fees under Delaware law for simply sending a letter to a company threatening additional litigation, without providing any additional corporate benefit. *Cf. Gilson v. Chock Full O'Nuts*, 331 F.2d 107 (2d Cir. 1964) (Friendly, J.) (awarding attorney's fees to shareholder who uncovered the unlawful acquisition of short swing profits and then brought the matter to the corporation's attention). Courts have granted fees on the basis of pre-suit demand letters, for the obvious reason that it

**D.      Request for Discovery**

Plaintiffs have also requested discovery in connection with their application for attorney's fees, including all documents relating to the resignations and depositions of five Citigroup directors.  In light of the conclusions above that the underlying action was not rendered moot and that there was no causal connection to a substantial benefit conferred on the company, discovery is not warranted.  *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.").

**III.    Conclusion**

For the foregoing reasons, Plaintiffs' motion for attorney's fees and request for discovery are DENIED.

The Clerk of the Court is directed to terminate the motion at docket number 52.

SO ORDERED.

Dated: New York, New York
       August 19, 2013

_____
J. PAUL OETKEN
United States District Judge

---

"would be penalizing efficiency and expediency" to punish plaintiff's counsel for succeeding in their aims "without the necessity of legal proceedings and at less expense." *Dottenheim v. Emerson Elec. Mfg. Co.*, 7 F.R.D. 195, 197 (E.D.N.Y. 1947).  Here, however, the letter at issue explicitly states that it is *not* a pre-suit demand letter, but rather that it is provided to Defendants "as a professional courtesy."  (Standstill Letter at 2-3.)  Again, the Court knows of no precedent for awarding fees in such a case, even where—unlike here—the plaintiffs demonstrate that their letter created a benefit to the corporation.